J-A29028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA :    IN THE SUPERIOR COURT OF
                                                     :            PENNSYLVANIA
                                                     :

             v.                                              :
                                                     :

JOHN BRADLEY PETERS, SR.         : 
                                                   :
                                                   :     No. 661 WDA 2021

Appeal from the Judgment of Sentence Entered April 28, 2021
In the Court of Common Pleas of Clarion County Criminal Division at
No(s):  CP-16-MD-0000010-2021

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                 **FILED: APRIL 27, 2022**

John Bradley Peters, Sr., appeals from the judgment of sentence imposed after a trial court convicted him of indirect criminal contempt ("ICC") for violating an existing protection from abuse ("PFA") order.[1]  We affirm.

We glean the following from the record.  Prior to the subject incident, Appellant and his wife, Stacey Peters, separated.  Of relevance to the underlying incident, Ms. Peters purchased a residence in Sligo, Pennsylvania, to restore and rent to third parties.  Before the parties' separation, Appellant

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  This order was entered pursuant to the PFA Act, 23 Pa.C.S. §§ 6101-6122. "The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse."  **E.K. v. J.R.A.**, 237 A.3d 509, 519 (Pa.Super. 2020) (cleaned up).

was involved in renovating the property. However, due to his unfinished work, the residence was not habitable.[2] As a result of an incident involving Appellant, Ms. Peters, and their adult son, John Bradley Peters, Jr. ("Junior"), Appellant was arrested on assault charges and proceeded to trial. After he was acquitted, Ms. Peters sought a PFA order. On October 30, 2020, a three-year final PFA order was issued in Jefferson County, which prohibited Appellant from having any contact with Ms. Peters. Thereafter, Appellant initiated divorce proceedings. Ms. Peters retained ownership of the Sligo residence.

On February 9, 2021, Ms. Peters and Junior drove in separate vehicles to the Sligo residence to pick up some items Ms. Peters had stored there. When they arrived, two cars they did not recognize were parked at the property, so Junior stopped his vehicle in the street and Ms. Peters stopped behind him. Ms. Peters rolled her window down and Junior came over to talk to her. At the same time, Appellant walked out of the residence and directly towards Ms. Peters' vehicle. Appellant told Junior that he was not to come in the residence and then continued to proceed towards Ms. Peters. When Appellant was about four feet from her vehicle, she asked him what he was doing there. Appellant stopped in the road and said that he owned the house

---

[2] Specifically, walls had been removed, a water pipe had burst, the gas and water utilities had been shut off, and the electric service did not extend to the second floor.

and lived there.[3]  Ms. Peters and Junior both called the police and Appellant walked away.  Junior returned to his vehicle, and he and Ms. Peters drove to a nearby gas station to wait for the police to arrive.

According to Appellant, he was staying at the Sligo residence temporarily to check the condition of the house and to repair his vehicle.  However, when Ms. Peters subsequently entered the Sligo residence, she discovered a heater, television, bed, small refrigerator, toaster oven, various kitchen utensils, and food.  Additionally, Appellant had purchased a modem and/or router five days before the incident and connected the residential network to the Internet.  Since the electricity did not reach the second floor, Appellant had run approximately four extension cords from the first floor to the second floor.

As a result of the foregoing interaction, Appellant was arrested for violating the PFA order.  Following a hearing, the trial court found Appellant guilty of ICC and sentenced him to pay a fine.  The trial court did not impose a period of incarceration or probation.  Appellant filed a post-sentence motion, which the trial court denied in part and granted in part.

---

[3] At the subsequent trial, Appellant testified that he did not speak with Ms. Peters that day.  However, Trooper Joshua McGinnis, one of the responding officers, testified that Appellant answered affirmatively when asked if the conversation between him and Ms. Peters occurred as described herein.

This timely filed appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.[4] Appellant raises the following issues:

> 1. That the trial court erred in convicting [Appellant] of [ICC], and subsequently not finding that said verdict was against the weight of the evidence presented during the trial.
>
> 2. That the trial court erred in concluding that sufficient evidence was presented during [Appellant's] trial to establish each of the elements necessary to sustain a conviction for [ICC].
>
> 3. That the trial court erred in convicting [Appellant] of [ICC], namely in that any potential violations were only *de minimis* in nature, and thus should have been dismissed as a matter of law.

Appellant's brief at 5 (unnecessary capitalization omitted).

We consider these issues in reverse order. Appellant argues that the ICC charge should have been dismissed as a *de minimis* violation pursuant to 18 Pa.C.S. § 312. Appellant's brief at 16.

"We review a trial court's failure to characterize an appellant's conduct as *de minimis* for an abuse of discretion." ***Commonwealth v. Sandoval***, 266 A.3d 1098, 1104 (Pa.Super. 2021) (cleaned up). Section 312 provides as follows:

> **(a) General rule.--**The court shall dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the conduct of the defendant:

_____

[4] At the direction of this Court, the trial court filed a supplemental opinion. ***See Commonwealth v. Peters***, ____ A.3d ____, 2022 WL 704263 (Pa.Super. filed March 9, 2022) (non-precedential decision).

(1) was within a customary license or tolerance, neither expressly negatived by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

(2) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

(3) presents such other extenuations that it cannot reasonably be regarded as envisaged by the General Assembly or other authority in forbidding the offense.

**(b) Written statement.--**The court shall not dismiss a prosecution under this section without filing a written statement of its reasons, except that if the attorney for the Commonwealth is the moving party for such dismissal no such written statement need be filed.

18 Pa.C.S. § 312. "The purpose of Section 312 is to remove petty infractions from the reach of the criminal law. An offense alleged to be *de minimis* in nature should not be dismissed where either harm to the victim or society in fact occurs." **Sandoval**, **supra** at 1104 (cleaned up).

In Appellant's post-sentence motion, he argued that the ICC charge should have been dismissed as *de minimis*. On appeal, Appellant elaborates that the violation should be classified as a petty infraction and *de minimis* because the encounter "did not cause harm to the victim or society[,]" and thus "was not the type intended to carry the stigma of a criminal conviction." Appellant's brief at 17.

In rejecting Appellant's claim that the violation was *de minimis*, the trial court concluded that none of the circumstances in § 312 apply. Regarding Appellant's argument that the encounter did not harm the victim or society,

the court found the conduct was not trivial and, in fact, threatened the harm sought to be prevented by the PFA order:

> The subject Order is intended to prevent future contact which may place a victim in reasonable fear of abuse, even when a defendant does not speak words which threaten harm. Here, [Ms.] Peters testified that she was scared when [Appellant] approached and got within four feet of her, apparently due to a history of abuse. It is irrelevant that [Appellant] did not say he was going to harm her. The [PFA order] and the [PFA] Act do not include an exception when a defendant speaks words which are non-threatening.

Trial Court Supplemental Opinion, 3/15/22, at unnumbered 4. Moreover, the court considered that despite the PFA order requiring Appellant to avoid situations where he could reasonably encounter Ms. Peters, Appellant occupied the Sligo residence with the knowledge that she "owned the house and had not given him permission to stay there and that she may come to the house." *Id*.

Appellant's "interpretation would eviscerate th[e PFA order's] purpose, as all violations of the order that did not result in physical . . . harm to the victim would be *de minimis*." **Commonwealth v. Cooper**, 217 A.3d 401 (Pa.Super. 2019) (non-precedential decision at 8); **cf. E.K.**, **supra** at 522 ("Because the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply[.]"). We agree with the trial court's analysis and hold that it did not abuse its discretion in concluding Appellant's conduct was not *de minimis*.

We next examine Appellant's sufficiency challenge. In doing so, we must determine "whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable a fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Gonzalez***, 109 A.3d 711, 716 (Pa.Super. 2015) (citations omitted). "In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. ***Id***. In addition, the evidence "need not preclude every possibility of innocence." ***Id***. The Commonwealth may meet its burden by wholly circumstantial evidence and "any doubt regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Id***. Moreover, "in applying the above test, the entire record must be evaluated and all evidence actually received must be considered." ***Id***. Finally, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Id***.

The PFA Act permits a court to punish and hold in contempt a defendant charged with ICC for violating a PFA order. ***See*** 23 Pa.C.S. § 6114(a). To establish ICC, the Commonwealth must prove the following four elements: "(1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; (2) the contemnor had notice of the order; (3) the act constituting the violation must have been volitional; and

(4) the contemnor must have acted with wrongful intent." ***Commonwealth v. Walsh***, 36 A.3d 613, 618 (Pa.Super. 2012) (citation omitted).

Appellant concedes that the first two elements were proven beyond a reasonable doubt. Appellant's brief at 12. However, he argues the Commonwealth failed to prove the contact was volitional or that his actions on "that day were committed with wrongful intent." ***Id***. at 12-13. In support, Appellant relies on this Court's decision in ***Commonwealth v. Haigh***, 874 A.2d 1174 (Pa.Super. 2005). Appellant's brief at 13. In ***Haigh***, the defendant was prohibited from having contact with his wife. However, at a PFA violation hearing, he engaged in conversation with his wife under the belief that the PFA order was relaxed in the courtroom context and where he only spoke out of concern for his wife's health.

On appeal to this Court, we observed that "[i]t is imperative that trial judges use common sense and consider the context and surrounding factors in making their determinations of whether a violation of a court order is truly **intentional** before imposing sanctions of criminal contempt." ***Haigh***, ***supra*** at 1177 (emphasis in original). Given the presence of a judge, deputy sheriff, prosecutor, and other persons in the courtroom, we concluded that acting intentionally in violation of the PFA order would have been irrational. Critically, however, the trial judge had specifically found the defendant rational enough on that day to enter guilty pleas. Thus, "[u]nder the peculiar circumstances" of that case, and "because we conclude[d] that the record d[id] not support the determination that [the defendant] intended to violate

- 8 -

the final PFA order **and** because the infraction was both *de minimis* and non-threatening, we [we]re constrained to hold that the trial court did abuse its discretion in convicting [defendant] of [ICC]." ***Id***. at 1178 (emphasis in original).

In the instant case, the trial court "imputed wrongful intent by virtue of the substantial certainty that [Appellant's] actions would place him in contact with the victim in violation of the PFA [o]rder." Trial Court Opinion, 7/9/21, at unnumbered 3. In concluding there was sufficient evidence to find Appellant guilty, the court observed that the PFA order was clear, that "[n]o contact means no contact[,]" and it essentially came down to "a credibility question[.]" N.T., 3/24/21, at 87. By staying at the Sligo residence for five days, the trial court found Appellant "set himself up to have contact with [Ms. Peters]" as follows:

> [Appellant] said he had no idea she was going to be there, but he knew things were stored there. He knew his belongings were stored there. So certainly there was the risk that she was going to be there, which he knew. He exposed himself to that risk.
>
> He put himself in the position where there was the possibility of having contact with her, and I think the PFA Order is clear enough that he was to avoid any realistic possibility that he would be in contact with her.
>
> And he knew that he was to avoid being in a situation where he may have contact with her. So it wasn't entirely inadvertent. It wasn't entirely unexpected.
>
> With regard to whether he approached and talked with her, I find that he did, based on the testimony of [Ms. Peters and Junior], and especially Trooper McGinnis who said this is what [Appellant] told him, that he did talk with her.

*Id*. at 89.

"[W]rongful intent can be imputed by virtue of the substantial certainty that by [engaging in the conduct], he would be in contact with her in violation of the PFA [o]rder." ***Commonwealth v. Brumbaugh***, 932 A2d 108, 111 (Pa.Super. 2007). Here, the terms of the PFA order clearly delineated the conduct prohibited and Appellant does not contest his knowledge of this order. By staying for several days at a residence owned by Ms. Peters and used actively by her for storage, it was reasonably certain that Appellant would encounter her. Moreover, when she did arrive and stop her vehicle in the street outside the residence, Appellant approached her vehicle, stopped four feet away in the street, and stated that he was living there and he owned the residence. Thus, unlike the defendant in ***Haigh***, Appellant did not approach Ms. Peters out of concern for her health in the presence of various officers of the court. Clearly, this contact was in violation of the PFA order and Appellant, who testified that he avoided responding to text messages from Ms. Peters in order to remain compliant with the PFA order,[5] was fully aware that direct contact with Ms. Peters would violate the PFA order. Accordingly, when viewed in the light most favorable to the Commonwealth, the evidence adduced at trial established beyond a reasonable doubt that Appellant intentionally

---

[5] We discuss the context for these messages as part of Appellant's weight challenge, *infra*.

engaged in conduct that violated the terms of the PFA order. Thus, the evidence was sufficient to sustain his ICC conviction.

Finally, we address Appellant's weight challenge. Our standard of review when presented with a weight of the evidence claim is distinct from that applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (cleaned up).[6] "An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." *Commonwealth v. Kane*, 10 A.3d 327, 333 (Pa.Super. 2010).

According to Appellant, there was no evidence presented to establish that he had "any intention of having contact with Ms. Peters on February 9, 2021." Appellant's brief at 10. Appellant argues that "[c]onflicting testimony

---

[6] We recognize the inherent incongruity in asking a trial judge to conclude that his non-jury decision shocked his own conscience. Nonetheless, this Court applies the same standard of review to weight claims regardless of whether the trial judge presided over a jury or non-jury trial.

was presented regarding the interaction" between Appellant and Ms. Peters, and that "at most, [Appellant] simply responded to [her] question . . . before walking back inside the home."[7] *Id*. at 11. Further, he avers that "Ms. Peters' engaging with [him] that day fit a pattern of similar behavior" in that she had previously texted Appellant in response to him filing divorce proceedings, purportedly requested to be his friend on Facebook accidentally, and contacted Appellant's sister about returning property he had requested. *Id*. at 11-12. Appellant claims that his non-responsiveness to these earlier entreaties by Ms. Peters "supports the contention that he had no willful contact in violation of the PFA [order] on February 9." *Id*. at 12.

The trial court, upon evaluating the evidence presented, found that Ms. Peters and Trooper McGinnis offered credible testimony, while Appellant did not. *See* Trial Court Supplemental Opinion, 3/15/22, at unnumbered 2. In rejecting Appellant's version of events, the court concluded that Appellant's stay at the Sligo residence was not temporary and that he had "voluntarily put himself in a position where he realistically could have contact with Ms. Peters and he did have contact with her, in violation of the PFA Order." *Id*.

_____

[7] Appellant is referencing the inconsistencies between Appellant's testimony and that of Ms. Peters, Junior, and Trooper McGinnis, discussed *supra*. Specifically, Appellant testified that he did not approach Ms. Peters' vehicle or speak with her that day. *See* N.T., 3/24/21, at 62-63, 69-70. Ms. Peters and Junior testified consistent with the recitation *supra* that Appellant did approach and speak with Ms. Peters. Finally, Trooper McGinnis testified that Appellant told him that Appellant had a conversation with Ms. Peters consistent with the one recounted by Ms. Peters and detailed *supra*. *Id*. at 74-75.

at 5. The court denied Appellant's weight claim, holding that "to ignore [Appellant's] testimony or to give it equal weight with all the facts is not to deny justice[ and t]here are no facts which are so contrary to the other evidence as to shock one's sense of justice." ***Id***.

As observed *supra*, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Gonzalez***, ***supra*** at 716. Upon review of the certified record, we conclude the trial court did not abuse its discretion in concluding that Appellant's verdict was not against the weight of the evidence. Accordingly, Appellant is not entitled to relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/27/2022</u>